SAUL M. WEINGARTEN AND MIRIAM E. WEINGARTEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 90525. Filed April 17, 1962.

*Saul M. Weingarten*, pro se.

*Robert H. Elliott, Jr., Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency of $2,738.40 in petitioners' 1958 income taxes.

The only issues in this case are:

(1) Whether petitioners sustained a theft loss which was discovered in the taxable year before us and, if so,

(2) The extent of the loss.

### FINDINGS OF FACT.

Most of the facts are stipulated and are hereby found as stipulated.

Petitioners, Saul M. Weingarten (hereinafter sometimes referred to as Saul) and Miriam E. Weingarten (hereinafter sometimes referred to as Miriam), husband and wife, reside in Pebble Beach, California. They filed their income tax return for 1958 with the district director of internal revenue, San Francisco, California.

Miriam's father, Charles E. Moore, died intestate on November 27, 1942, while Miriam was still a minor. Her mother, Kathryn Moore (hereinafter sometimes referred to as Kathryn), was appointed guardian of her person and estate by the Probate Court of Calhoun County, Michigan.

Two-ninths of her father's estate was distributed to Miriam. Some portions of these distributions were placed by Kathryn in a savings account (hereinafter sometimes referred to as "the guardianship account") at the Michigan National Bank of Battle Creek, Michigan. The guardianship account was in the name of Kathryn as guardian of Miriam.

By 1949 Miriam and her mother had moved to Los Angeles, California. On January 21, 1949, Miriam was married to Saul, a law student, who was subsequently admitted to practice in California. Miriam became 21 on April 1, 1949. Thereafter Kathryn petitioned the Probate Court of Calhoun County, Michigan, for discharge from the guardianship, which petition was granted on July 26, 1949. Subsequently, Kathryn filed with that court a receipt and release signed by Miriam acknowledging receipt of the assets of the guardianship.

On September 12, 1949, the guardianship account was closed by the withdrawal of $6,840.68 and a savings account in the same bank was opened by deposit of the same amount in the names of "Miriam E. Moore Weingarten or Kathryn Moore PAYABLE TO EITHER OR SURVIVOR." At the time of the opening of the latter account (hereinafter sometimes referred to as "the joint account") Miriam signed a signature card for the account. Kathryn had frequently given Miriam papers to sign in connection with Miriam's inheritance and Miriam had always signed the papers without question and frequently without having read them. Kathryn had always handled all the financial

arrangements in their family and continued to do so after the death of Miriam's father. Miriam had no dealings with financial matters either before or after she became 21.

Miriam knew of the existence of the joint account but not of its size. Prior to Kathryn's death, Miriam never had possession of the joint account passbook. Kathryn told Miriam that the joint account was a reserve fund, available to Miriam if needed. Miriam never inquired from her mother or the attorneys for the estate as to any of the details of the account.

Kathryn remained in Los Angeles until 1955 or 1956. Thereafter until Kathryn's death petitioners and Kathryn all resided in Pebble Beach, California, although in separate homes. Miriam's relationship with her mother, whom she saw several times a week during this period, was at all times cordial and friendly.

Kathryn "lived well" throughout the period from 1949 until her death in October 1958. During this time Kathryn did not give Miriam gifts of cash or items of property. However, Miriam occasionally inquired as to her mother's need for funds and sometimes made cash gifts to her mother. Petitioners' gifts to Kathryn during 1958 and payments of her medical and funeral expenses totaled at least $2,624.03.

While Kathryn resided in Pebble Beach, California, she lived in a house owned and maintained by her son, Miriam's brother. Miriam was aware that a substantial portion of Kathryn's support was being furnished by that brother.

Several weeks before Kathryn passed away, she told Miriam she had taken money from the joint account and requested Miriam's forgiveness. Kathryn also said she had left a letter for Miriam. Miriam had never before known of Kathryn's withdrawals from the joint account.

After Kathryn died, there came into Miriam's possession the passbook for the joint account and also a sealed letter, addressed to Miriam, dated May 1, 1951, and reading as follows:

Mimi Darling

From time to time it has been necessary to borrow from the savings account—so in payment am leaving you the Sears Roebuck Stock which is more than ample for the loan.

I appreciate the loan Darling. All else you will find in perfect shape.

All the love in the World.

Mommie

On August 10, 1950, $1,493.43 was deposited in the joint account. The first withdrawal, in the amount of $3,402, was made on September 21, 1950. The subsequent withdrawals, all made after the date of the letter set forth hereinabove, occurred on and after December 12, 1955. The last withdrawal prior to the closing of the account was made on

March 21, 1958. All withdrawals except the one closing the account were made by Kathryn. Kathryn's withdrawals from the joint account totaled $7,897. Miriam never deposited money in the joint account.

Kathryn left assets of $217.04, and debts in excess of that amount. The assets were distributed to Miriam's brother, who paid the debts.

Miriam did not intend to grant Kathryn an ownership interest in the $6,840.68 transferred from the guardianship account to the joint account and Kathryn did not believe such an interest had been granted to her. The sums Kathryn withdrew from the joint account were not given to Miriam nor were they used for Miriam's purposes.

OPINION.

## Issue 1.

Petitioners maintain they suffered a loss due to embezzlement discovered in the taxable year before us. Although petitioners point to no statutory provision allowing deduction for such losses, respondent assumes, and we do also, that petitioners' claim is based upon the relevant provisions of section 165 [1] of the Internal Revenue Code.[2] Respondent contends there has been no embezzlement.

We agree with petitioner.

It is clear that the term "theft," as used in section 165, includes embezzlement. Sec. 1.165–8(d), Income Tax Regs.; Cal. Pen. Code sec. 490a.[3] The issue of whether a loss arose from theft is to be determined under the applicable State law. *Michele Monteleone*, 34 T.C. 688, 692 (1960), and cases there cited. The deduction does not depend upon whether the thief or embezzler is convicted or even prosecuted. *Paul C. F. Vietzke*, 37 T.C. 504 (1961); *Michele Monteleone, supra* at 694; *Warner L. Jones*, 24 T.C. 525 (1955).

Although the joint account was in a Michigan bank, withdrawals were made by mail deposited in California and the fraudulent appro-

---

[1] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. &ast; &ast; &ast;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

[2] All statutory references are to the Internal Revenue Code of 1954 unless indicated otherwise.

[3] Our recent decision in *Estate of R. L. Adame*, 37 T.C. 807 (1962), distinguishing between "theft" and "embezzlement," related only to the problem of fraud with intent to evade tax (see *James v. United States*, 366 U.S. 213 (1961)) and is not relevant to the issue we face here.

priations, if any, took place when the withdrawn funds were used by Kathryn for her own purposes and not for Miriam's purposes, such uses all occurring in California.[4] Both parties maintain, in effect, that the issue of whether petitioners' loss was on account of theft is to be determined under California penal law, which, both parties aver, is the same as Michigan penal law for these purposes. It is not necessary to decide whether this Court can be bound by the parties' agreement on these matters since we conclude, *infra*, that California penal law applies of its own force to Kathryn's actions.

"Embezzlement" is defined under California law (Cal. Pen. Code sec. 503) as "the fraudulent appropriation of property by a person to whom it has been intrusted." It is not necessary that a formal trust be created in order to find that the property has been entrusted. Cal. Pen. Code sec. 506.[5] See *People* v. *Steffner*, 67 Cal. App. 23, 227 Pac. 699 (Ct. App., 3d Dist., 1924).

The money withdrawn from the guardianship account and deposited in the joint account had been held by Kathryn for the use of Miriam, only in her capacity as guardian of Miriam's property. We conclude that the money used to open the account and later withdrawn by Kathryn belonged to Miriam.

Although Kathryn appeared under Michigan law to have an ownership interest in the property as against the rest of the world,[6] this statutory presumption is not conclusive as between the depositors and is rebuttable. *Van't Hof* v. *Jemison*, 291 Mich. 385, 289 N.W. 186 (1939). Cf. *Jacques* v. *Jacques*, 352 Mich. 127, 89 N.W. 2d. 451 (1958), in which the Michigan Supreme Court affirms the proposition that the presumption is rebuttable but does not find sufficient evidence to counteract the presumption in that case. In effect, that presumption is held to place both the burden of coming forward with evidence and the burden of persuasion on one who would attack the presumption.

We have determined that Miriam had no intention to transfer any

---

[4] While we know that Kathryn's permanent residence was in California from 1949 until her death, we have no other evidence suggesting that all of the funds Kathryn withdrew from the joint account were withdrawn by mail deposited in California and were used in California. However, respondent states on brief that the funds were so withdrawn and used by Kathryn for her personal purposes and petitioners appear to assume the same. In the absence of any evidence indicating the contrary we will so treat Kathryn's withdrawals and use of the funds.

[5] Sec. 506. Person controlling or intrusted with property of another; misappropriations; payment of laborers and materialmen as use of contract price

Every *trustee*, banker, merchant, broker, attorney, agent, assignee in trust, executor, administrator, or collector, *or person otherwise intrusted with or having in his control property for the use of any other person,* who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, * * * is guilty of embezzlement * * *. (Enacted 1872. As amended Stats. 1907, c. 490, p. 892, § 1; Stats. 1919, c. 518, p. 1090, § 1.) [Emphasis supplied.]

[6] Mich. Stats. Ann. sec. 23.303 provides that any bank account registered in the form of this joint account creates a joint tenancy with right of survivorship and each party may withdraw the entire amount in the account.

ownership interest in this money to Kathryn. (See *People* v. *Kirkpatrick*, 77 Cal. App. 104, 246 Pac. 84, 85 (Ct. App., 2d Dist., 1926), where the court found that as to certain funds given to the defendant, "there is nothing in the evidence to indicate either a gift or a loan." The court there concluded that the money was entrusted to the defendant, subject to embezzlement by him, and was in fact so embezzled.) We credit Miriam's testimony as to her intentions (see *People* v. *Stanford*, 16 Cal. 2d. 247, 105 P. 2d. 969, 970 (1940), where the court stressed the fact that the defendant "knew that Mrs. Stevens was unaccustomed to business dealings, had implicit confidence in him and signed everything he gave her to sign") and are impressed by Kathryn's letter and her deathbed confession that she, too, did not understand that Miriam gave her an ownership interest in Miriam's money in the joint account.

We conclude that petitioners have carried their burden of persuading us that Kathryn did not have an ownership interest in the money in the account above-described as belonging to Miriam. Within the terms of Cal. Pen. Code sec. 506, *supra*, Kathryn was a "person otherwise intrusted with or having in [her] control property for the use of any other person."

Since Kathryn appeared to be an owner of the joint account neither California (Cal. Fin. Code sec. 852) nor Michigan (Mich. Stat. Ann. sec. 23.303) would forbid her to withdraw money from the account, at least in the absence of some agreement with Miriam not to do so. Such withdrawal does not necessarily require a conclusion that the money had been appropriated improperly by Kathryn, since she might have transferred the amounts withdrawn to Miriam or used it for some purpose approved by Miriam.

However, when Kathryn received the withdrawn amounts in California and used it there for her own purposes (see footnote 4, *supra*), then she appropriated those amounts for a "purpose not in the due and lawful execution of [her] trust." Cal. Pen. Code sec. 506, *supra*. As we have noted above, Kathryn indicated on at least two occasions that she knew she was misappropriating Miriam's funds. Such knowing misappropriation of entrusted funds constitutes fraudulent appropriation under California law and completes the elements of the crime of embezzlement. *People* v. *Talbot*, 220 Cal. 3, 28 P. 2d 1057, 1061–1062 (1934).[7]

---

[7] "* * * The crime of embezzlement is purely statutory, and legislation with reference thereto resulted from the failure of prosecutions under the common-law crime of larceny to reach a case where the possession of property was obtained by consent, and the resulting breach of trust by the agent, officer, or bailee, although it as effectually deprived the owner of his property as though it had been taken out of his possession by stealth, was not punishable at common law. In the case of People v. Gordon, 133 Cal. 328, 65 P. 746, 747, 85 Am. St. Rep. 174, speaking of our Code definition of embezzlement, the court says: 'The essential elements of embezzlement are the fiduciary relation arising where one intrusts property to another, and the fraudulent appropriation of the property by the latter.' There would seem to be no hidden meaning in the use of the word fraudulent

Respondent argues that "a withdrawal by a joint owner cannot constitute embezzlement," citing *People* v. *Cravens*, 79 Cal. App. 2d 658, 180 P. 2d 453 (Ct. App., 1st Dist., 1947). That case and the cases and materials cited in it depend upon the usual statutory requirement for embezzlement that the property taken be property "of another." This has been interpreted to mean that the property must be *wholly* of another.

We have found that Miriam and Kathryn did not understand that Kathryn was to have an ownership interest in Miriam's money. As between Miriam and Kathryn, Kathryn had no ownership interest in the property. Consequently, as to Kathryn, the money used to open the joint account was property *wholly* of another.

However, even if it be considered that Kathryn's bare legal title might be sufficient to give her an "interest" in the property, it does not follow that Kathryn could not embezzle funds from the joint account.

In *Cravens* the court stated that (180 P. 2d at 456) :

Since by opening the joint bank account Mrs. Reame voluntarily placed a title in common to her money in appellant and voluntarily placed it in his power to withdraw the funds therefrom as owner he could not be guilty of embezzlement or larceny. People v. Foss, 7 Cal. 2d 669, 670, 62 P. 2d 372; People v. Hotz, 85 Cal. App. 450, 452, 259 P. 506; cases collected in the notes in 17 A.L.R. 982 and 31 L.R.A., N.S., 822; 29 C.J.S., Embezzlement, § 16, p. 693; 36 C.J., Larceny, sec. 153d, p. 782. * * *

It is clear that this statement constitutes a holding. However, every authority cited in *Cravens* for that proposition involved the question of whether the defendant, if he was a partner, could be guilty of embezzling partnership property. None of the cited materials exonerated a defendant from an embezzlement charge on the ground that he had an ownership interest in the property, unless that defendant was held by the court to be a member of a partnership owning the property. Even in *Cravens*, the joint bank account was opened by the complaining witness for herself and the defendant therein in order to allow the defendant to use her money in their partnership. There was no further discussion in *Cravens* regarding joint bank accounts and we have not been cited to nor have we found any other California cases which hold or even state anything with regard to embezzlement from joint bank accounts.

In the cases relied upon in *Cravens* and in *Cravens* itself, where a partnership was found it was clear that those who gave the money to the defendants did so with the intention of granting the defendants an

in such definition. It is true that where, as in the cases of People v. Royce, 106 Cal. 173, 37 P. 630, 39 P. 524, and People v. Page, 116 Cal. 386, 48 P. 326, the money is deposited in the personal account of the defendant but no evidence is introduced showing that it was ever converted to his own use, no 'fraudulent appropriation' is shown. But we are sure that if the evidence in such cases showed, without question, an appropriation of the money to the personal use of the defendants, and contrary to the purposes of the trusts, the fraudulent intent would have been imputed to them."

ownership interest in the money and with the expectation that the defendants would make active use of those funds. Since the defendants had an ownership interest and the real authority to use the money as owners, holding them guilty of embezzlement might plausibly be construed as violating the common-law doctrine that one may not steal from himself.

The cases and other materials relied upon in *Cravens* indicate that the general rule that partners cannot embezzle partnership property has been limited in practice in a number of ways: no partnership was found in *People* v. *Foss*, 7 Cal. 2d 669, 62 P. 2d 372 (1936) (member-officer of association held to have acted as agent), and *People* v. *Hotz*, 85 Cal. App. 450, 259 Pac. 506 (Ct. App., 2d Dist., 1927) (defendant, who was to share equally in profits, held to have acted as agent), and the other authorities cited all indicate that a taking prior to fulfillment of conditions of a conditional executory partnership agreement can be an embezzlement and that a taking by a partner entrusted with winding up a partnership business after liquidation can be an embezzlement. 17 A.L.R. 985; 31 L.R.A. (N.S.), 823; 29 C.J.S., Embezzlement, sec 16, p. 693; 20 C.J., Embezzlement, sec. 35, p. 445.

The latest version of the American Law Institute's Model Penal Code provides, at section 206.11(1) thereof (Tent. Draft No. 2, p. 100 (1954), renumbered sec. 222.11(1) at Tent. Draft No. 11, p. 4 (1960)) that:

(1) *Generally.* It is no defense to a charge of theft that the actor is an owner or co-owner of the property or has any other interest therein, if the person deprived also has an interest to which the actor is not entitled [with exceptions not here relevant].

The American Law Institute's comment on this section is as follows:

1. Co-ownership Generally.
Subsection (1) removes any doubt as to the liability of a partner or tenant-in-common or co-owner of a joint bank account for stealing from the other parties who share an interest in the same property. At common law, and still in some states, convictions are prevented by the conception that each of joint owners has complete title to the jointly owned property, so that he cannot misappropriate what already belongs to him. Whatever the merits of such notions in the civil law, it is clear that they have no relevance to the criminal law's effort to deter deprivations of other people's economic interests.

Modern legislation has moved towards the position taken in the text, either by expanding the classes of persons who may be guilty of embezzlement, or by general provisions comparable to that of the text.

We note that apparent absence of California cases directly on point; the apparent rationale of somewhat analogous California cases; existing limitation on the doctrine that one who has an interest in property cannot embezzle that property; and the persuasive reasoning of the American Law Institute. Although the issue is not free from

doubt, on the basis of the California statutes and decisions as we find them and in the absence of any clear authoritative statements of California law to the contrary, we conclude that California courts would not exonerate Kathryn on these facts on the ground that she was a joint owner of all the funds in the joint bank account.

In *Grover Tyler*, 13 T.C. 186 (1949), this Court disallowed as a theft loss deduction the value of Government bonds taken by petitioner's estranged wife when she left him. The bonds were registered as follows: "Grover Tyler [address] or Mrs. Alice M. Tyler." The bonds were all bought with his money. We noted that (1) although the petitioner's wife told him of her intention to take the bonds, he made no effort to stop her; (2) he did not institute criminal proceedings against her; (3) he did not attempt to have the bonds canceled and new ones issued; (4) the law generally, and particularly in Ohio (we cited *State* v. *Phillips*, 85 Ohio 317, 97 N.E. 976 (1912)), where the takings occurred, did not hold a wife guilty of larceny when she took and converted to her own use her husband's personal property.

*Tyler* was relied upon also in *George Ungar*, 18 T.C. 688 (1952), affd. 204 F. 2d 322 (C.A. 2, 1953). The Court of Appeals opinion made it clear that "New York law recognizes the common-law doctrine that a wife who takes her husband's property without his consent does not commit larceny or embezzlement."

The facts and the applicable State law in those cases differ in material respect from the instant case as indicated in the Findings of Fact and Opinion herein. Compare *People* v. *Graff*, 59 Cal. App. 706, 211 Pac. 829 (Ct. App., 2d Dist., 1922), where it was held that under California law a wife can be prosecuted for embezzlement of her husband's property. We conclude that petitioner has sufficiently demonstrated Miriam's funds were embezzled by her mother.

Kathryn's expressed intention (see her letter to Miriam, *supra*) to treat the withdrawn amounts as loans and to repay the "loans" by leaving securities to Miriam does not affect the fraudulent nature of the appropriation (see *People* v. *Talbot*, 28 P. 2d 1057, 1061) although it might have been considered in mitigation of punishment had she in fact replaced the amounts withdrawn. Cal. Pen. Code secs. 512, 513.

Since there is no dispute that the embezzlement was discovered by Miriam in 1958, it is clear that petitioners are entitled to deduct in 1958 their loss on account of the theft discussed herein. Sec. 165(e), *supra*.

On this issue we find for petitioners.

### Issue 2.

Petitioners have sought to deduct $7,974 on account of the embezzlement found in Issue 1. On their 1958 Federal income tax return they

arrived at this figure by subtracting the $1,031 remaining in the account at Kathryn's death from "a total of $9,005 standing to taxpayers' credit."

Respondent maintains that if we find an embezzlement loss occurred, we should not allow a deduction greater than $6,403.57. He arrives at this figure by subtracting from the $7,897 withdrawn by Kathryn the $1,493.43 deposited in the joint account in 1950.

We agree with respondent.

Petitioners have submitted no evidence substantiating the $9,005 figure used by them in arriving at the loss. On the other hand, the evidence clearly indicates that Kathryn's withdrawals totaled $7,897 and, since those were the only withdrawals prior to Miriam's withdrawal of the balance, no more than $7,897 could possibly have been embezzled by Kathryn from the joint account.

Although we are convinced that the $6,840.68 with which the joint account was opened came entirely from funds belonging to Miriam, we can find no evidence justifying a conclusion that the 1950 deposit of $1,493.43 also belonged to Miriam. Whatever conclusion we might reach concerning the order in which the deposited funds were withdrawn, it is clear that Miriam's loss could not have included the amount of the 1950 deposit.[8] Consequently, we agree with respondent that Miriam's deductible loss is to be determined by subtracting from Kathryn's total withdrawals the amount of the 1950 deposit.

In order to give effect to these determinations and to the fact that petitioners did not contest certain deficiency items,

*Decision will be entered under Rule 50.*

---

[8] As joint tenant with right of survivorship Miriam had access to the funds remaining in the account after her mother's death; she in fact did withdraw those funds; and petitioners have treated the amount so withdrawn as a reduction of the loss sustained by them.