Estate of Ira A. Campbell, deceased, Donald Cameron and Lucian J. Clarke, executors and Estate of Zella Fay Campbell, deceased, Lucian J. Clarke, administrator, c.t.a. v. Commissioner.
Estate of Campbell v. Commissioner
Docket No. 85391.
United States Tax Court
T.C. Memo 1964-53; 1964 Tax Ct. Memo LEXIS 284; 23 T.C.M. (CCH) 398; T.C.M. (RIA) 64053; March 2, 1964
*284 Earl Q. Kullman, 120 Broadway, New York, N. Y., and Folger Brink, for the petitioners. Marie L. Garibaldi and Leo A. Burgoyne, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in income tax and additions to tax for the years 1950 and 1951 as follows: Additions
to Tax Sec.
294(d)(1)(A),
Year
Deficiency
I.R.C. of 1939
1950
$11,992.51
$18,900.46
1951
31,046.96
2,794.21 Petitioner claims an overpayment for the year 1950. The issues are (1) whether petitioner is entitled to a business bad debt deduction in 1950 or 1951 for loans advanced by Ira A. Campbell to Charles W. Harrison and Bruce Harrison or, in the alternative, whether petitioner is entitled to an embezzlement loss in the amount of the loans; (2) whether petitioner is entitled to a business bad debt deduction in 1950 of $29,429.26 for the amounts advanced by Ira A. Campbell to Athermoplast Products, Inc. and (3) whether petitioner is liable for additions to tax in 1950 and 1951 under section 294 (d)(1)(A) of the Internal Revenue Code of 1939[1] for the failure of Ira A. Campbell and Zella Fay *285 Campbell to file a declaration of estimated tax for those years. Findings of Fact Some of the facts were stipulated and they are so found. Ira A. Campbell and Zella Fay Campbell, both now deceased, were residents of New York, New York. They filed joint returns for 1950 and 1951 with the then collector of internal revenue for the Third New York District in New York, New York. Ira died in March 1963 and Zella died in February 1954. The Estates of Ira A. Campbell and Zella Fay Campbell will hereinafter be called petitioner or petitioners. Ira and Zella did not file a declaration of estimated tax for the years 1950 and 1951. From 1902 until his retirement about 1960, Ira was engaged in the practice of law. During most of this period he specialized in admiralty law, and after practicing in Seattle, Washington (to about 1909), San Francisco, California (to 1918) and an interval in Washington, D.C. in Government work dealing with admiralty law, Ira went to New York in 1919 where he joined a law firm. During the years here involved Ira was a senior partner in the firm *286 of Kirlin, Campbell & Keating. In 1912 Ira acquired certain ranch land in Tulare County, California, which he leased for a number of years, and in 1963 Ira still owned about 400 acres of land in Tulare County. In the 1920s Ira became a stockholder in Skinner Automotive Device Company, Inc. (later succeeded by Skinner Motors, Inc.), which manufactured oil rectifiers, oil reclaimers and other automobile accessories and also developed a new type of internal combustion engine. Subsequently, Ira became a stockholder in Skinner Purifiers, Inc., which manufactured oil filters. Ralph L. Skinner was the managing officer of all three of the Skinner corporations, which were all located in Detroit, Michigan. Skinner Purifiers, Inc. was sold to Bendix Aviation Company in 1946 and Ira realized a substantial profit on the sale of his stock. In the 1920s Ira made an investment in the Dempsey Oil Corporation which was drilling oil wells in Oklahoma. In the 1920s Ira invested in several theatrical ventures. In 1928 Ira became a stockholder in American Bio-Chemical Laboratories, Inc. which was formed to develop and market certain drug products developed by L. W. Tomarkin. The name of the corporation *287 was later changed to Campbell Products, Inc. In 1950 the corporation was liquidated and Ira reported a substantial long-term capital gain in 1950 arising from this transaction. Subsequently one of the principal products which had been manufactured by Campbell Products, Inc., was sold for a substantial price. Ira later acquired an interest in a copartnership, Campbell Pharmaceutical Co. In 1928 Ira invested in the Knight Filter Co., which corporation manufactured a filter developed by Charlotte S. Knight. In the 1940s Ira became a stockholder in Tax Control Records, Inc., a corporation which prepared income tax returns for its customers on the basis of records kept in books prepared and sold by the corporation. About 1940 Ira acquired an interest in Modern Waterproofing Paint Company, which was organized to manufacture a waterproofing paint under a license obtained by L. W. Tomarkin from a French company. Ira sold his interest in a successor corporation in 1954. In the 1940s Ira became a stockholder in Complete Combustion Company which manufactured an apparatus for the burning of fuel oil. In 1946 Ira advanced funds to enable Michel F. Mabardi (or Lombardi) to manufacture a chemical *288 product which had been developed by him. The product, Pyrosal, was used to improve the burning of fuel oil without causing smoke. The project was later abandoned. In 1948 Athermoplast Products, Inc. was organized to sell plastic dental products. L. W. Tomarkin had acquired a license from a company in Switzerland which owned the process for making the product. In the years 1948 through 1950 Ira and Zella each owned 25 percent of the stock in Athermoplast Products, Inc. and during this period Ira advanced $29,429.26 to the corporation. In 1950 the corporation ceased its operations. Ira advanced funds at various times to The Columbium Corporation, a company promoted by a certain Wolfson who had obtained concessions on mineral properties in British Guiana. Ira also advanced funds to assist T. H. Nakken in the development and manufacture of a third dimensional lens which had been invented by Nakken. At various times Ira acquired interests in, or advanced funds to, several other ventures including a corporation organized under the laws of Panama to develop mining concessions in Peru, the development of mechanical atomizers and other apparatus for use in burning fuel oil, a corporation *289 which owned a large number of patents granted to Alexander Rava involving, in part, improved welding techniques, and a corporation engaged in chartering refrigerated vessels for transporting farm products between Texas and New York. Ira was instrumental in forming several of the above corporations. Although he was an officer of some of the corporations, he did not draw any salary from them. Ira received few dividends from the corporations. In a will executed by Ira on August 29, 1961 he made provisions for the disposition of his stock interests in Campbell Pharmaceuticals, Inc., Skinner Motors, Inc., The Columbium Corporation, and his interest under an agreement with T. H. Nakken concerning the development of the third dimensional lens. During the years 1940 through the middle of 1951, Ira continually made loans to Charles W. Harrison. Many of the loans were made in amounts of $500. By 1951 Ira had advanced a total of about $422,000 to Charles, and Charles had repaid about $62,500. Harrison died in July 1951. Ira also loaned $4,721.62 to Bruce Harrison (Charles' son) in 1951 to complete the drilling of an oil well begun by his father. As of the end of 1951 the net outstanding *290 amount of loans made by Ira to Charles and Bruce Harrison was $364,636.87. The amounts loaned to Charles over the years were used by him in a variety of business ventures, including a general ship brokerage and chartering business, the development of a new cargo handling device on ships, and a timber and lumber operation. Late in the 1940s Charles began to acquire oil leases in Louisiana. By November 1950, when Ira visited Charles in Louisiana, Charles had not begun drilling any oil wells, and in subsequent exchange of letters Ira expressed incomprehension over the fact that drilling had not yet begun, and he also referred to a new well then about to be drilled. At various times over the years Charles gave signed notes in blank to Ira. In the joint income tax return for 1950 Ira claimed a business bad debt deduction of $29,429.26 due to the worthlessness of loans made by Ira to Athermoplast Products, Inc. over the years 1948 to 1950. In the joint income tax return for 1951 Ira claimed a business bad debt deduction in the amount of $364,636.87. Of this total, $359,915.25 represented net loans made to Charles W. Harrison during the years 1940 through the middle of 1951, while the *291 amount of $4,721.62 represented advances to Bruce Harrison. Respondent disallowed the business bad debt deduction of $29,429.26 in 1950 on the grounds (1) that the advances to Athermoplast Products, Inc. represented contributions to capital and were therefore deductible only as long-term capital losses, or (2) that the amount in question was a non-business bad debt and deductible only as a short-term capital loss. Respondent also determined that the amount of $364,636.87 represented a nonbusiness bad debt in 1951 and was deductible in that year as a short-term capital loss. Opinion The first issue is whether the Harrison bad debt [2] is a business bad debt deductible in full under section 23(k)(1) or a nonbusiness bad debt deductible as a short-term capital loss under section 23(k)(4). Section 23(k)(4) defines a nonbusiness debt as "other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." It is petitioner's contention that Ira, apart from his distinguished *292 career of more than 50 years in the active practice of admiralty law, was also engaged during the years 1904 through 1950 in the trade or business of "organizing, promoting, investing in lending money to and managing numerous commercial enterprises or of doing one or more of these things", and that the Harrison bad debt was connected with this trade or business. The evidence is far from satisfactory as to the exact nature of Ira's participation in the various ventures over the years. Much of the evidence is contained in a 16-page "Memorandum on Business Activities" apparently prepared by Ira and submitted to the examining revenue agent early in 1955. The document is unsigned and undated and, of course, the maker could not be interrogated with respect to the memorandum. However, we admitted the document and we feel it does give us some impression of the nature and scope of Ira's financial dealings over the years. We have considered this memorandum, together with the other evidence, and we conclude that Ira's financial participation in the series of enterprises over the years did not constitute a separate trade or business. The pattern that emerges from the evidence is quite apparent. *293 Ira was generally ready to finance the development of products conceived by others or to provide the financial support for commercial enterprises brought to his attention. A corporation was usually organized to carry out the venture, although on occasion the operation was carried on in some other form. There is no convincing evidence to show that Ira provided any appreciable services to the various corporations. His field was admiralty law, which occupied his full time, and he had no special training in the various fields covered by the various enterprises in which he was interested, which includes automobile accessories, drugs, salt filters, water-proof paint, tax record systems, oil, timber, mining and real estate. Ira drew no salaries from the corporations and received few dividends from them. There is nothing in the record to indicate that Ira promoted these various corporations and enterprises for a fee or a commission, or for a profit on their sale. The record does show that one of the Skinner corporations was sold to Bendix Aviation Company in 1946 for a substantial profit, and it also appears that one of the drug products manufactured by one of the corporations was, after that *294 corporation's liquidation, sold for a substantial price. But these are no more than isolated instances which obviously do not form any pattern when viewed in the context of Ira's financial enterprises over the years. Ira's role was that of an investor whose profit would come from the enhancement in value of his investment due to the successful operations of a venture. It is difficult from the record to determine the exact nature of Ira's dealings with Charles W. Harrison. Over a period of more than 10 years Ira provided Charles with a steady stream of funds, sometimes weekly. A substantial number of the advances over the years was in amounts of $500. By the middle of 1951 the net amount of obligations owed by Charles to Ira was about $360,000. It appears that Charles signed some notes in blank and left them with Ira. None of the witnesses was able to explain the Harrison transactions. The memorandum in evidence merely indicates that Ira loaned money to Harrison who was, at various times, engaged in various business ventures that included a ship brokerage and chartering business, a new cargo handling device, and a timber and oil operation. There is no indication, apart from the fact *295 that the loans were made, of the nature of Ira's participation in the Harrison ventures. We cannot say, on this record, that the Harrison loans made by Ira over the years give any support to the argument that Ira was in any trade or business apart from his practice of admiralty law. In Whipple v. Commissioner, 373 U.S. 193, the Supreme Court expressly disapproved of the argument that one who is actively engaged in financing and serving his own corporations, even though numerous, for the purpose of creating future income through those enterprises is in a trade or business, and stated that "[absent] substantial additional evidence, furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k)(4)." The Court narrowed considerably the type of activity which would constitute a trade or business. After pointing out that full-time service by a taxpayer to many corporations was no more effective in creating a trade or business than was full-time service to a single corporation, the Court said: To be sure, the presence of more than one corporation might lend *296 support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see Giblin v. Commissioner, 227 F. 2d 692 * * * (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *. On the basis of this record we find that Ira's participation in the various enterprises over the years did not amount to a trade or business within the meaning of Whipple v. Commissioner, supra. We hold that petitioner is not entitled to a business bad debt deduction of the net amount of the Harrison loans either in 1950 or 1951. There is no evidence in the record to support the suggestion in petitioner's brief that Ira and Charles W. Harrison were joint venturers. Nor is there any merit to petitioner's contention that the Harrison debt became worthless in 1950 rather than 1951. Ira claimed the debt as a bad debt deduction in his 1951 return, explaining that Charles W. Harrison had died on July 24, 1951 and *297 that he was "hopelessly insolvent when he died." Petitioner has failed to prove that the year in which the Harrison debt became worthless was other than 1951. Petitioner makes a brief alternative argument that part of the Harrison debt [3] is deductible as an embezzlement loss in 1950 under section 23(e)(3). [4] It is claimed that Ira made loans to Charles W. Harrison on Charles' representation that the money would be used in acquiring oil leases and drilling wells, and that during a visit by Ira to Charles' home in Louisiana in November 1950 it turned out that Charles had not drilled any wells. There is in evidence an exchange of letters by Ira and Charles in which the situation is further discussed and in which both Ira and Charles refer to a contemplated new oil well about to be started. A witness at the trial testified that after the Louisiana visit Ira "appeared to be a very much depressed and dejected individual." *298 We cannot find, on the basis of the meager and ambiguous evidence in the record, that Ira suffered a "theft" loss in 1950 within the meaning of section 23(e)(3). Whether or not such a loss occurred depends upon the applicable state law. Michele Monteleone, 34 T.C. 688. We have examined the relevant sections of statutory law for both New York and Louisiana, and we are firmly convinced that petitioner's nebulous evidence in this case fails completely to spell out the requisite "theft" under the statutes of either state. The nature of Ira's participation, if any, in the Harrison ventures does not emerge from the record. All we can tell, with any assurance, is that the advances were loans and that they were treated as such by Ira. We also can glean from the record that Ira was somehow misled by representations by Charles as to the progress of certain oil well ventures. It is obvious that with these facts alone it is impossible to say that any "theft" occurred under any applicable state law. It is also of some significance, we think, that Ira continued to advance money to Charles after the purported embezzlement was discovered in November 1950, and by the end of June 1951 *299 it appears that Ira advanced at least $15,000 more to Charles in a continuous series of small amounts. We find, and so hold, that Ira did not incur a loss in 1950 due to "theft" within the meaning of section 23(e)(3). For the reasons discussed above in connection with the Harrison debt, we also sustain respondent's determination that Ira was not entitled to a business bad debt deduction in 1950 2n the amount of $29,429.96, representing advances made by Ira to Athermoplast Products, Inc. over a period of about two years (1948-1950). [5]The corporation was formed in 1948 to market in this country a dental product under a license from a Swiss company. Ira and his wife each owned 25 percent of the corporation's stock. In 1950 the corporation ceased operations. The advances were a part of the pattern over the years, as shown in our findings of fact, of financial assistance supplied by Ira to numerous ventures. As indicated above, it has not been established that Ira, through these activities, was in a trade or business within the meaning of Whipple v. Commissioner, supra, and consequently there is no justification for the deductions of these loans to Athermoplast Products, *300 Inc. as a business bad debt. We hold for the respondent on this issue. Respondent also determined that Ira and Zella were liable under section 294(d)(1)(A) for failure to file declarations of estimated tax for the years 1950 and 1951. The statute imposes liability unless such failure to file was due to reasonable cause and not to wilful neglect. Petitioner's brief does not address itself at all to the failure to file the necessary returns, but merely states that Ira's failure to pay estimated tax in 1950 (nothing is said about 1951) was due to a shortage of cash and current assets. In any event, we have held that this does not constitute reasonable cause for the failure to file the estimated returns. Rene R. Bouche, 18 T.C. 144; see Sidney V. LeVine, 24 T.C. 147. Petitioner presents no other explanation which we could regard as reasonable cause for failure to file the estimated returns. We sustain respondent on this issue. Decision will be entered for the respondent. *301 Footnotes
1. All section references will be to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
2. Respondent states on brief that the amount of the debt is not an issue.↩
3. Petitioner's brief indicates that the portion of the debt supposedly embezzled "was at least $270,000, the amount advanced from 1945-1951." ↩
4. Section 23(e)(3) allows a deduction for losses sustained by an individual during a taxable year and not compensated for by insurance or otherwise "of property not connected with the trade or business, if the loss arises from * * * theft." It is clear that the term "theft" includes embezzlement. See Samuel M. Weingarten, 38 T.C. 75↩.
5. Respondent also determined these advances were capital contributions. We do not decide this because of our disposition that they do not in any event constitute business bad debts.↩