DONNA C. SOLOMON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Solomon v. Commissioner
Docket No. 3055-76.
United States Tax Court
T.C. Memo 1978-41; 1978 Tax Ct. Memo LEXIS 475; 37 T.C.M. (CCH) 218; T.C.M. (RIA) 780041; January 30, 1978, Filed Gerald Kogan, for the petitioner. David M. Berman, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency in petitioner's 1971 Federal individual income tax, and additions to tax, as follows: Additions to Tax, I.R.C. 1954 Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1971
$32,551.42
$3,255.14
$2,336.65 The petitioner having conceded certain matters, the primary question presented for our decision is whether petitioner sustained an embezzlement loss and, if so, the amount of such loss. Also at issue are the additions to tax for late filing and for negligence pursuant to sections 6651(a) and 6653(a), I.R.C. 1954, respectively. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner, Donna C. Solomon, resided in North Miami, Florida, *477 at the time her petition in this case was filed. She filed a Federal individual income tax return for the calendar year 1971 on October 18, 1972, with the Southeast Service Center at Chamblee, Georgia. Petitioner's father, John H. Solomon, died in July 1968. At the time, petitioner was 17 years of age. She had just completed boarding school in Miami, Florida, and was living with her father in Potomac, Maryland. Her parents had been separated for approximately one year, and her mother and younger brother and sister resided in Tennessee. Rather than going to live with her family in Tennessee after her father's death, petitioner elected to enter the University of Miami as a freshman in the fall of 1968, and went to live with her cousin, Stanley Solomon, who had a home in North Miami. Prior to his death, John Solomon had established several trusts of which petitioner was a beneficiary. Two such trusts, the "John Solomon Trust A" and the "John H. Solomon Trust", were administered by Loma Linda University as Trustee. During the period from her father's death through 1971, petitioner's sole source of income (save a small amount of bank interest) was the income which she received *478 from these two trusts. In 1971, she reported total income from these two trusts of $99,121.07. [1]
Petitioner purchased a house in North Miami, Florida, on August 16, 1968, and lived there until April 16, 1971, at which time she sold the property and moved into another house which she had purchased. Petitioner's uncle, James Solomon (her father's brother), her cousin Stanley Solomon (James' son), and Stanley's wife, two children, and mother-in-law all moved into petitioner's new house with her in August 1968. Stanley's family continued to live with petitioner for about two years, during which time petitioner was their major source of financial support. James Solomon lived in petitioner's house until the fall of 1971. Petitioner provided virtually all of James' support, claiming him as a dependent on her 1971 tax return. Petitioner's father, John Solomon, and her uncle, James Solomon, had been business partners. In the 1940's and 1950's, they had operated a successful real estate business in Florida, but subsequently they split up and *479 John moved out of Florida. James apparently fell on hard times, and was at some point forced into bankruptcy. In the summer of 1968 he was unemployed and had no independent source of income. He may have been holding himself out as a construction and real estate developer, but he was not at that time involved in any actual construction or development. During the period from 1968 through 1971, when James was living in petitioner's house, he did not, to petitioner's knowledge, hold any job, but he did spend considerable amounts of time frequenting bars and race tracks. At least once, on or about February 23, 1971, he was arrested and charged with a criminal activity that may have been related to gambling. Petitioner felt considerable affection for her uncle James and, after her father's death, allowed him to become something of a "father figure" to her. Not only did she invite him to share her home, but she turned to him for financial advice respecting her trust income. At her uncle's suggestion, on November 19, 1969, she formed the 1865 Corporation for the purpose of investing in real estate. While documents of incorporation were filed with the State of Florida, the 1865 Corporation *480 never issued any stock, nor did it conduct proper corporate meetings or maintain corporate records. It opened checking account number XXX-542-5 at the Second National Bank of North Miami. James became president of the 1865 Corporation; he and petitioner were the authorized signatories for its checking account. James, on behalf of the 1865 Corporation, became involved in a partnership with one John Toppa for the construction of five houses. As late as the fall of 1970, checks were drawn on the 1865 Corporation checking account to pay certain expenses in connection with that construction. [2] Thereafter, however, James did not engage in any further real estate ventures on behalf of the 1865 Corporation. At James' suggestion, petitioner deposited all or a substantial portion of her trust income in the 1865 Corporation's corporate checking account, and those funds were the only funds available for the corporation's operations. As of January 1, 1971, the *481 1865 Corporation checking account showed a balance of $4,919.43. Between January 1 and October 26, 1971, credits totalling $123,510.86 were made to the account, [3] but on October 14, 1971, when petitioner closed out the account, it had a balance of only $341.80. During 1971, James drew 34 checks payable to cash, in a total amount of $14,756; he drew 55 checks payable to himself, or payable to cash and endorsed by himself, in a total amount of $59,800. In addition, petitioner drew 9 checks payable to James, or payable to cash and endorsed by James, in a total amount of $3,940. From the time of the corporation's formation until October 1971, in addition to paying expenses connected with their real estate venture, both petitioner and James drew checks on the corporate account to make mortgage and car payments, and to pay other living and household expenses. Both James and petitioner also drew checks on the corporate account to obtain cash. Although petitioner anticipated that James would use corporate funds only for real estate ventures *482 and for personal living expenses, she did not formally limit his authority to draw on the corporate account. She was aware that, while living in her house, James ran into heavy debt because of his gambling, and on at least one occasion she signed a corporate check to provide money to post bond after James had been arrested on a criminal charge that she thought might have involved gambling. Nonetheless, petitioner was not aware, prior to October 1971, of the exact amounts being withdrawn by James from the 1865 Corporation checking account. For one thing, after February 1971 James had the bank hold monthly statements for him to pick up, so petitioner did not regularly see them. And James did not keep complete records of the checks which he drew, nor did he draw checks in numerical sequence from the checkbook which both he and petitioner used. About October 13, 1971, petitioner, at the suggestion of a friend, took the corporate checkbook from her uncle's bedroom, where it was kept, and examined it carefully. She was surprised and angered at the size of her uncle's withdrawals from the account, and at the fact that complete records apparently had not been kept. Immediately, on October *483 14, she closed out the 1865 Corporation checking account and transferred the remaining funds into a personal account of her own. Thereafter, she confronted her uncle and told him to move out of her house. She did not request an explanation of the large withdrawals, nor did James proffer one. James moved out of the house, and did not return to petitioner's home to live until some months later. Subsequent to the altercation which terminated in James' moving out of petitioner's house, James did offer an explanation for the large withdrawals. He told petitioner that he had invested in certain racing dogs and also in a race track, partly in Florida and partly in the South American nation of Colombia. He further told petitioner that although he did not have records of his investments, he would obtain them for her. At the time, petitioner believed James' explanation and indeed paid for a trip to Colombia for him to obtain the necessary documentation. No documentation was ever obtained. Petitioner retained a Mr. Howard Neu, an attorney, to prepare her 1971 Federal income tax return. On the return prepared by Mr. Neu, a deduction was claimed for embezzlement losses sustained by petitioner *484 through James' appropriation of funds from the 1865 Corporation checking account. Petitioner refused to sign this return because she accepted her uncle's explanations for the amounts withdrawn from the corporate account, and because she did not want to get her uncle into trouble over his use of the corporate funds. After refusing to sign the return prepared by Mr. Neu, petitioner had a second return prepared by an accountant, Mr. Philip Paul, who had been recommended to her by her uncle.This return contained a Schedule C showing the following business losses: Item
Loss Claimed
Training Costs of 3 Race Horses
$11,660.00
Training, Feeding & Breeding Costs
in Greyhound Race Dogs - Abandoned
35,000.00
$46,660.00 Petitioner signed this second return in reliance upon her uncle's representations that he had incurred losses in those amounts in pursuit of the 1865 Corporation's business, and that he would obtain documentation of the losses. In connection with the preparation of her second 1971 return, petitioner wrote a letter to Mr. Paul which contained the following: My failure to execute the Return as prepared by Mr. New (sic) and this letter of authorization *485 to you are being done freely by me and without any coercion or undue influence being exerted upon me. In particular I would call to your attention the fact that in the year 1971 I was fully aware of all monies received by me of certain and several trusts created by my late father, wherein I am beneficiary. Further I would inform you that at all times I was aware and consented to the disbursement, investment and other uses to which this income was made by my Uncle, James N. Solomon. Petitioner never filed criminal charges against her uncle on the basis of his appropriation of funds of the 1865 Corporation. Further, petitioner never attempted to recover any of such funds from her uncle or her uncle's estate, [4] nor were any amounts ever repaid her. Subsequent to 1971, petitioner entrusted to James the task of selling her interest in certain real property located in Tennessee. Petitioner also continued to give James spending money and to pay for his medical care, and at times permitted James to live in her house for extended periods. James was killed in an automobile accident in May 1975. The Commissioner, *486 in his notice of deficiency dated January 16, 1976, disallowed petitioner's claimed deductions in respect of the alleged business losses arising from racing dog and racehorse operations. He also disallowed a claimed business loss on the sale of real property, and asserted instead that petitioner had had a gain on the sale of her personal residence in April 1971.Finally, he made certain other adjustments not in issue here, and determined additions to tax for late filing and negligence under sections 6651(a) and 6653(a), I.R.C. 1954. [5] The petitioner has abandoned her claim to business losses in 1971, [6] and now asserts instead that she suffered an embezzlement loss in excess of $46,600 as a result of her uncle's appropriation of funds from the 1865 Corporation checking account. The petitioner does not contest the Commissioner's determination in any other respect except for the imposition of the additions to tax for late filing and negligence. *487 OPINION There is no doubt that losses were sustained on account of Uncle James' withdrawals of funds from the 1865 Corporation checking account. Although petitioner claimed deductions therefor on her 1971 return as business losses she no longer seeks to support that position. Rather, she now contends that she is entitled to a deduction under section 165, I.R.C. 1954, on the ground that these funds were embezzled by James. The Commissioner denies that she suffered a deductible embezzlement loss. The Commissioner further argues that she has in any event not established the proper amount of her alleged embezzlement loss; that the loss, if any, was that of the 1865 Corporation rather than petitioner's own loss; and that the loss, if any, was properly deductible in a year other than 1971. Section 165(a) and section 165(c)(3) allow individuals to deduct losses arising from theft and not compensated for by insurance or otherwise. It is well established that the word "theft" includes "any criminal appropriation of another's property to the use of the taker", see *488 Edwards v. Bromberg,232 F. 2d 107, 110 (C.A. 5), and that embezzlement losses are properly deductible so long as the embezzlement constitutes a crime under the laws of the jurisdiction in which the events took place. Weingarten v. Commissioner,38 T.C. 75, 78; Muncie v. Commissioner,18 T.C. 849, 851. The gist of petitioner's argument is that she suffered an embezzlement loss when her uncle misappropriated, for his own personal use, funds which he had fraudulently induced her to place in a checking account against which he could draw checks. Section 811.021 of the Florida Statutes, as in effect in 1971, provided the following definition of the crime of larceny: (1) A person who, with intent to deprive or defraud the true owner of his property * * * or to appropriate the same to the use of the taker * * * (a) Takes from the possession of the true owner * * * or obtains from such person possession by color or aid of fraudulent or false representations or pretense, or of any false token or writing * * * or (b) Having in his possession, *489 custody or control * * * any money [or] * * * property, or article of value of any kind, appropriates the same to his own use * * * * * *
steals such property, and is guilty of larceny. 22 Fla. Stat. Annot. Section 811.021 (1965) (Repealed, 1974); see 22A Fla. Stat. Annot. Section 812.021 (1976). In State v. Oates,330 S. 2d 554, 556 (District Court of Appeals of Florida, 4th District, 1976), it was held that "[one] obtaining personal property by trick, device, or fraud, intending to appropriate it, is guilty of larceny on subsequent appropriation". We think this reasoning could apply to one who fraudulently induced another to place funds in a checking account from which the wrongdoer could draw at will, even though it has been held in Florida that one cannot, in general, commit larceny by drawing funds from a joint checking account. See Escobar v. State,181 So. 2d 193, 195 (District Court of Appeals of Florida, 3d District, 1965). Cf. Vietzke v. Commissioner,37 T.C. 504, 511. Petitioner has failed, however, to establish *490 the elements of this crime under Florida law. In the first place, she has not demonstrated that James had the requisite fraudulent intent when he recommended that petitioner form the 1865 Corporation and deposit in its checking account her own trust income. James represented that the corporation would be used to undertake construction and real estate activities, and he did in fact engage in some construction activity on behalf of the corporation. And although it appears that he did use corporate funds to pay his own gambling debts and other expenses which petitioner did not specifically authorize, there is no showing that he intended to do so from the outset. Cf. Ex Parte Stirrup,19 So. 2d 712, 713 (Fla. 1944); Youngker v. State,215 So. 2d 318, 323 (District Court of Appeals of Florida, 4th District, 1968). Despite the strong suggestion that James used some of the 1865 Corporation funds to pay gambling debts, bail bondsmen's charges, and other expenses connected with drinking and gambling, the record provides no basis for determining what portion of James' withdrawals were so used. On the other hand, James had in previous years used corporate *491 funds for business purposes connected with a real estate deal, and he claimed during 1971 and thereafter that in 1971 he was still investigating and/or pursuing business deals on behalf of the Corporation. Petitioner, the only witness, was unable to state what, if any, portion of James' withdrawals might in fact have been invested in business deals which subsequently went sour. Further, petitioner has failed to convince us that James' use of 1865 Corporation funds for such purposes as gambling and drinking was not at least tacitly authorized by her. It is true that James originally proposed that the corporation be used only as a vehicle for real estate dealings and to pay family and household expenses. And we accept petitioner's assertions that she trusted her uncle and that she had no idea, until October 1971, of the size of his withdrawals from the corporate account.But petitioner was aware that her uncle had no outside source of income and yet spent much time in bars and at the race track. She herself wrote checks for substantial amounts payable to James, and at least once wrote a check to cover the expenses of a bail bondsman. We think that she must have known, or at least *492 suspected, that James was using funds from the 1865 Corporation checking account to support his gambling and other activities, and yet she failed to take any steps whatsoever to oversee the use of the corporate checking account. Nor did she take legal action against James after discovering the scope of his withdrawals. We find, on the basis of the record as a whole, that petitioner has failed to establish that she suffered losses on account of embezzlement as that term is defined by the Florida criminal statute.
Finally, there is strong support for the Government's position that to the extent that there may have been a theft loss, it was a loss that was deductible by the corporation and not by petitioner. To hold otherwise would require ignoring the corporate entity. The 1865 Corporation was created to carry on at least some business activities, and any funds allegedly embezzled by Uncle James were taken from its bank account. Petitioner's position on the merits appears to be so weak that we do not consider any other possible alternative arguments advanced by the Government. Petitioner's only contention in respect of the additions to tax for late filing and negligence, sections *493 6651(a) and 6653(a), I.R.C. 1954, is that her conduct in connection with her 1971 individual income tax return was excused by the problems she faced as a result of her uncle's behavior, and in particular by his never-fulfilled promise to provide documentation of the claimed business losses. Inasmuch as neither petitioner nor her uncle maintained any records whatsoever in support of the substantial business deductions claimed by petitioner, we think the addition to tax for negligence was entirely reasonable.And since petitioner, after obtaining an extension of the deadline for filing through August 1972, did not obtain a further extension of the deadline and did not in fact file her return until October 1972, we think the Commissioner correctly imposed a 10 percent addition to tax for late filing. Decision will be entered for the respondent. Footnotes
1. Petitioner was the sole beneficiary of two smaller trusts which, however, made no distributions to her during the years 1968-1971.↩
2. Petitioner's 1970 individual income tax return reported a loss on the sale of residential real estate with a gross sales price of $35,000. The property involved was some or all of the houses constructed by James and John Toppa.↩
3. The source of the credits in excess of petitioner's trust income ($99,121.07 for the entire year 1971) is nowhere explained in the record.↩
4. James died in May 1975, as will appear shortly hereinafter.↩
5. The Commissioner limited the late filing penalty to 10 percent because his records showed that petitioner had obtained extension of the time for filing her 1971 return through August 1972, while the return was in fact filed in October 1972. ↩
6. Petitioner has not explicitly conceded the Commissioner's finding that she had a gain on the sale of her personal residence in 1971, but she has offered no evidence to challenge the Commissioner's determination of gain.↩