SIDNEY DEMBNER and EVELYN DEMBNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dembner v. Commissioner
Docket No. 1359-72.
United States Tax Court
T.C. Memo 1974-180; 1974 Tax Ct. Memo LEXIS 139; 33 T.C.M. (CCH) 773; T.C.M. (RIA) 74180; July 8, 1974, Filed. *139 The petitioners made loans, pledged stock as security for loans, and paid money for stock to be issued pursuant to various requests for funds mady by their son-in-law. The loans were not repaid, and the stock was not issued. Held, the funds and pledge were not obtained under circumstances constituting thefts under sec. 165(c), I.R.C. 1954; held further, one loan and part of the payment made to secure the return of the pledged stock resulted in worthless nonbusiness debts in 1968 under sec. 166(d), I.R.C. 1954. Ronald F. Kidd, for the petitioners. Jeffery C. Kahn, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined the following deficiencies in the petitioners' Federal income taxes: Year
Deficiency 1965
$3,127.00
1966
7,059.60
1967
1,989.00
1968
6,524.00
1969
2,444.00
The issues which must be decided are whether transfers of certain money and property by the petitioners (1) were obtained under circumstances which constituted thefts under section 165(c) of the Internal Revenue Code of 1954, [1] or (2) resulted in worthless nonbusiness debts in 1968 under section 166(d). FINDINGS OF FACT Some of the facts have been stipulated, *141 and those facts are so found. The petitioners, Sidney Dembner and Evelyn Dembner, husband and wife, resided in Wescosville, Pennsylvania, at the time of filing their petition herein. They filed their joint Federal income tax returns, using a cash method of accounting, with the district director of internal revenue, Philadelphia, Pennsylvania, for the years 1965, 1966, 1968, and 1969, and with the district director of internal revenue, Newark, New Jersey, for the year 1967. The petitioners' daughter, Marian Dembner, married Sheldon Turner in October 1966. He was employed by the Jet Lithographing Corporation (Jet) of New York, of which Irving Malkin was an owner. During April 1967, Mr. and Mrs. Turner approached Mr. and Mrs. Dembner to borrow funds to allow Mr. Turner to enter into a new printing business with Mr. Malkin. The business was to be called Trylon. Based on assertions made by Mr. Turner, Mr. and Mrs. Dembner believed that Trylon was a going printing business currently owned by a widow who wanted to sell her interest and that Mr. Turner's investment was going to be used to purchase it. Mrs. Dembner promised to loan him $16,000 which he intended to use in the business. *142 On April 24, 1967, Mrs. Turner, signing as Marian Dembner, drew a check for $6,000 on an account at the American Bank and Trust Co. of Pa. Although Mrs. Turner drew the check, the funds in the account belonged to her parents. Subsequently, Mr. Turner ceased working for Jet and, after Mr. Malkin withdrew from the proposed venture, went into the printing business for himself under the name of Dayna Lithographers (Dayna) of New York. During May 1967, Mr. Turner, doing business as Dayna, purchased a lithographing machine from Jet for $6,825. Out of the $6,000 he had received in April, he made a downpayment of $2,325 on the machine. Mr. Turner assumed a series of notes for the rest of the purchase price; 23 notes were issued in June 1967. Only 7 notes, amounting to $1,400, were paid; the $3,100 balance was not paid. Mr. Turner used the rest of the $6,000 to purchase inventories and rent a loft. On May 23, 1967, still doing business as Dayna, he purchased an offset press from Royal Zenith Corporation (Royal Zenith) under a conditional sales contract. Since he received a credit toward the purchase price by reason of trading in the machine he had purchase earlier from Jet, the balance *143 payable under the contract was $24,264.23. From August to December 1967, he made 5 installment payments, amounting to $2,025.00, leaving unpaid $22,239.23. On June 2, 1967, Mrs. Dembner drew a check to Mr. Turner for $10,000 on the account at the American Bank and Trust Co. of Pa. Such check represented the remaining part of the $16,000 she had promised him in April. About the middle of June 1967, Mr. and Mrs. Turner signed a promissory note, due January 1, 1968, for $16,000 to Mrs. Dembner in return for the loan. Mrs. Dembner and Mrs. Turner opened a savings account with a bank in New York through which the loan was to be repaid. Mr. Turner promised to pay $75 a week and, every 3 months, a portion of the business profits to the savings account. Three hundred dollars was deposited on June 5, 1967; $300, on July 7, 1967; and $1,160, on July 26, 1967. No later payments were made on the loan. Subsequently, Mr. Turner sought additional funds for his business, and in July 1967, Mrs. Dembner pledged 870 shares of American Telephone and Telegraph (AT&T) stock owned by her as security for a loan granted by the Chase Manhattan Bank (Chase) of New York in the amount of $31,000; *144 the proceeds were to be used for purchasing machinery and providing working capital for Mr. Turner's business. Mr. and Mrs. Dembner believed that Mr. Turner was planning to utilize $25,000 of the proceeds to purchase a machine for cash. Mr. Turner had explained to Mrs. Dembner that he preferred to borrow the necessary funds from a bank instead of financing the purchase of the machine through a conditional sales contract because the interest payments under such contracts were much greater than interest rates charged by banks. Mr. and Mrs. Dembner agreed to the security arrangement because of their belief, based on profit projection sheets shown to them by Mr. Turner, that the business would operate with higher profits if it had additional machinery. On July 11, 1967, the same day the Chase loan was granted, Mr. Turner, doing business as Dayna, purchased an offset press from Royal Zenith under a conditional sales contract. He made a deposit of $10,000.00 on the machine, leaving a balance payable on the contract of $19,780.11 (including the finance charges). The deposit was made from the proceeds of the Chase loan. From August to December 1967, Mr. Turner made installment payments, *145 totalling $2,060.00, under the contract, leaving a balance of $17,720.11, which he did not pay. On July 12, 1967, a certificate of incorporation was filed for Dayna Litho Corp. (Dayna Corp.) in New York County, New York. It was organized as a successor to Dayna. Its authorized capital stock was 200 shares of no-par value, of which Mr. Turner owned 180. In November 1967, Mr. Turner asked for further funds for the business from Mr. and Mrs. Dembner; at that time, they discussed issuing shares of Dayna Corp.'s stock to Robert Dembner, the son of Mr. and Mrs. Dembner. Mr. Turner told Mr. and Mrs. Dembner that the business was progressing and that it was on a successful trend. They believed that it was a very successful and expanding enterprise, although, in fact, it was only a marginal operation and in financial difficulties. On November 13, 1967, Mr. and Mrs. Dembner wrote 2 checks to Mr. Turner, who in turn endorsed them to Dayna Corp.; the checks totaled $10,000. In return for the money, Mr. Turner promised to issue some shares of Dayna Corp. stock to Robert Dembner, but never did so, although Mr. and Mrs. Dembner later repeatedly requested him to issue the shares. Three *146 days before the checks were drawn to Mr. Turner, on November 10, 1967, 10 shares of the Dayna Corp. were issued to Herbert Turner, Mr. Turner's brother. By a letter dated February 23, 1968, Mr. Turner pledged the 180 shares he owned to an acquaintance, from whom he occasionally borrowed money. On November 30, 1967, the Chase loan was transferred to the Chemical Bank New York Trust Company (Chemical) and increased to $40,000. The transfer extinguished the debt due to Chase. The Chemical loan was later increased to $50,000, and in the early part of 1968, $8,000 was paid to Chemical reducing the balance due to $42,000, which was not paid. On December 12, 1967, Mr. Turner pledged 124 shares of AT&T stock, and 260 shares of City Gas Company of Florida (City Gas) stock, which Mrs. Turner owned, as partial security for the Chemical loan. Mrs. Dembner executed a similar pledge in January 1968 wherein she pledged her 870 shares of AT&T stock to Chemical to secure the loan. After payments on the loan had ceased, Chemical advised Mrs. Dembner and Mrs. Turner that the loan was in default and that it intended to foreclose on the pledged stock. On July 25, 1968, an agreement was reached *147 whereby Chemical was to be paid $42,000 for releasing the pledged stock. Pursuant to that arrangement, Chemical and Mr. and Mrs. Dembner and Mrs. Turner executed mutual general releases of legal liability on causes of action arising out of the pledging agreements. Mrs. Dembner's and Mrs. Turner's stock was returned to them on August 1, 1968, after Mr. and Mrs. Dembner had paid the $42,000 to Chemical. On July 25, 1968, the closing stock price was $52 per share for AT&T and $14 per share for City Gas. During 1968, Mr. and Mrs. Dembner paid $3,350 of attorney's fees for negotiating the agreement with Chemical. Subsequently, Mrs. Turner transferred her City Gas and AT&T shares to her parents because she felt she was responsible for the losses incurred by them as a result of their advances to Mr. Turner. On January 3, 1968, Mr. Turner borrowed $13,500 from Mrs. Dembner for personal expenses. In exchange for the money, he signed a promissory note due May 1, 1968, for $13,500 in Mrs. Dembner's favor; the note was not paid. Part of the proceeds of the loan was used to pay gambling debts incurred by Mr. Turner and Mr. Malkin. Mr. Turner told Mrs. Dembner that he urgently needed *148 the money because Mr. Malkin was in personal danger from his creditors and that he had guaranteed payment of Mr. Malkin's debts. He also told her that if he did not receive the money, he was going to sell the business and go to California. As she had invested so much money in the business already, she felt she had to protect her investment by lending him the amount he requested. Mr. and Mrs. Turner separated in the early part of 1968. About the same time, Mr. Turner left Dayna Corp. and moved from the New York City area, where they had been residing. He had few personal assets when he left. After his departure, he wandered around for a while. Mr. and Mrs. Dembner did not know his subsequent whereabouts, although their attorney did conduct a limited investigation and gave them some information about his location and activities. In the fall of 1971, while on a business trip, Mr. and Mrs. Dembner located Mr. Turner in Florida. In the early part of 1969, while visiting in New York City, Mrs. Dembner went to the district attorney for the county in which Mr. and Mrs. Turner had lived. Her purpose in going there was to request the district attorney to institute a criminal action *149 against Mr. Turner for his conduct in obtaining funds from her. The district attorney did not initiate criminal prosecution against Mr. Turner on this matter. On April 15, 1972, Mr. and Mrs. Dembner commenced a civil action against Mr. Turner; in part, the suit was directed toward restitution of the funds Mr. Turner had obtained from them and the money spent, including the lawyer's fees, to secure the return of the pledged stock. In 1968, Mrs. Turner wished to institute suit against him to account for the funds he had received from her parents, but after she recounted the events of the past year, her attorney did very little with the information. Throughout the period when Mr. Turner was operating the business, its overall profit was low and its financial position was weak, although Mr. Turner intended to create a going business and worked to achieve that end. He had extensive business expenditures, including payments on the loans and sales contracts, salaries for his employees, rent, and payments for office furniture and equipment. Only occasionally did the receipts from the business meet the operating costs, and Mr. Turner was required to borrow money to pay his expenses. *150 In addition to his business expenditures, Mr. Turner, during that period, supported his wife and their child, who was born in August 1967. After Mr. Turner left Mrs. Turner, she did not support herself and received no support payments from Mr. Turner. Mr. and Mrs. Dembner furnished support for her and the child. On their Federal income tax return for the year 1968, the petitioners claimed a casualty loss deduction for the amounts loaned to Mr. Turner, the amounts paid for the Dayna Corp. stock, the amounts spent in redeeming the pledged stock, and the amounts paid as lawyer's fees. On March 28, 1969, they filed an application to carry back the loss with the district director of internal revenue, Philadelphia, Pennsylvania, which was tentatively allowed for the years 1965, 1966, and 1967. In his deficiency notice, the respondent determined that the petitioners had not suffered a casualty loss and disallowed the deductions taken for it in 1968 and the tentative carryback allowances for 1965, 1966, and 1967. He also determined that certain miscellaneous deductions taken in 1968 and 1969 were not allowable. The parties have now reached agreement as to the treatment of those miscellaneous *151 deductions. OPINION The first issue we must decide is whether the petitioners have sustained a theft loan entitling them to a deduction pursuant to section 165. Although, on their return for 1968, the petitioners claimed a deduction for a casualty, loss, the issue presented to us is whether they are entitled to a deduction for a theft loss. Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." However, section 165(c) provides in part: In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * "Theft," as used in section 165, is "a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property * * *." Edwards v. Bromberg, 232 F.2d 107, 110 (C.A. 5, 1965); *152 Carroll J. Bellis, 61 T.C. 354 (1973). It has been determined that a theft, for tax purposes, occurs when there is an appropriation of property which constitutes the crimes of larceny by false pretenses, embezzlement, and kidnapping for ransom. Evelyn Nell Norton, 40 T.C. 500 (1963); affd. 333 F.2d 1005 (C.A. 9, 1964); Saul M. Weingarten, 38 T.C. 75 (1962); sec. 1.165-8(d), Income Tax Regs.; Rev. Rul. 72-112, 1972-1 C.B. 60. A taking of property in the course of the crimes of larceny by false promises and extortion would also constitute theft. Whether a theft has been committed depends on the law of the jurisdiction where the alleged theft occurred. Michele Monteleone, 34 T.C. 688 (1960). The parties agree that New York law is controlling in this case. The petitioners argued that the $16,000 loan by Mrs. Dembner in early 1967 was secured by fraudulent misrepresentations by Mr. Turner and that such misrepresentations constituted larceny under New York law. They asserted that Mr. Turner's conduct in obtaining the loan constituted larceny by false pretenses. *153 Under New York law, the crime of false pretenses consists of an intentional misrepresentation of a material fact upon which another relies in parting with property. People v. Miller, 167 N.Y. 339, 62 N.E. 418 (1902); People v. Pollack, 38 Misc. 2d 1075, 239 N.Y.S. 2d 602 (Sup. Ct. 1963); N.Y. Penal Law, sec. 155.05(2) (a) (McKinney 1967).[2] To be found guilty of such crime, a person must have a criminal "intent to deprive another of property." Sec. 155.05(2); People v. Morris, 332 N.Y.S. 2d 248, 39 App. Div. 2d 750 (Sup. Ct. 1972); People v. Powell, 256 N.Y.S. 2d 117, 22 App. Div. 2d 959 (Sup. Ct. 1964). At most, the petitioners' evidence shows that Mr. Turner purchased assets to form his own business, rather than purchasing the stock of an incorporated business as the Dembners understood. A showing of the difference between what was actually done and what the Dembners understood would be done falls short of establishing an intent to defraud. See People v. Greenfield, 40 Misc. 2d 704, 243 N.Y.S. 2d 836 (Sup. Ct. 1963). Thus, the petitioners have failed to establish *154 that the $16,000 loan was obtained by the crime of false pretenses. The petitioners also argued that Mr. Turner's conduct in securing the loan constituted the crime of larceny by false promises. Section 155.05(2) (d) provides: (d) By false promise. A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or, as the case may be, does not believe that the third person intends to engage in such conduct. In any prosecution for larceny based upon a false promise, the defendant's intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed. Such a finding may be based only upon evidence establishing that the facts and circumstances of the case are wholly *155 consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant's intention or belief that the promise would not be performed; However, at the time Mr. Turner obtained the loan from Mrs. Dembner, New York had no crime of larceny by false promises. N.Y. Penal Law, sec. 1290 (McKinney 1944); People v. Karp, 298 N.Y. 213, 81 N.E. 2d 817 (1948). Section 155.05(2) (d) did not become effective until September 1, 1967, several months after Mr. Turner made the promises which secured him the loan. In addition, such section requires a very high degree of proof of the requisite criminal intent. Practice Commentary, sec. 155.05. Mr. Turner's failure to perform the promise which the Dembners understood him to be making was the only evidence offered by them, and the statute is explicit in providing that such evidence is insufficient to establish that the crime of larceny by false promises has been committed. Moreover, Mr. Turner's partial performance of the promise is inconsistent with a finding of a guilty intent. Consequently, the petitioners have also failed to *156 show that Mr. Turner's conduct in obtaining the loan constituted the crime of larceny by false promises. The petitioners urged that Mrs. Dembner's pledge of her AT&T stock as security for the Chase and Chemical loans was obtained by the crimes of false promises and false pretenses. They relied upon their understanding that Mr. Turner intended to use the proceeds of the Chase loan to purchase machinery for cash and Mr. Turner's failure to do so. Their contentions concerning the criminality of Mr. Turner's behavior in obtaining the pledge are subject to the same defects as their claim that his conduct in securing the $16,000 loan was criminal. A discrepancy between a promise and the actual course of conduct subsequently undertaken fails to demonstrate the criminal intent required for the crimes of larceny by false pretenses and false promises. Furthermore, the allegedly false promises occurred in the summer of 1967, prior to the effective date of the statute which created the crime of larceny by false promises. Since the pledge was not obtained through criminal conduct, the petitioners are not entitled to a theft loss deduction for any loss they may have suffered as a result of *157 the pledge. Concomitant to deducting the amounts spent in securing the return of the stock, the petitioners also deducted the amounts they paid to the attorney who helped them obtain the return of the stock when Chemical threatened to foreclose on it. They argued that Katherine Ander, 47 T.C. 592 (1967), applies here; it allowed a deduction for attorney's fees which were incurred pursuant to restoring fraudulently converted property. However, because there was no theft of the stock, or of the money spent in obtaining its return, Katherine Ander does not apply, and the petitioners may not deduct the attorney's fees as a theft loss. With regard to the $10,000 Mr. Turner received in November 1967 in exchange for issuing stock to Robert Dembner, the petitioners contended that he obtained the money through larceny by false promises. They based their contention on the fact that although Mr. Turner promised to issue the stock, he never did so and, instead, transferred interests in Dayna Corp. elsewhere. The section which defines larceny by false promises is explicit and stringent on the issue of intent. Practice Commentary sec. 155.05. The section clearly provides *158 that the intent not to perform as promised may not be inferred from nonperformance alone. The petitioners have failed to provide us with any facts other than Mr. Turner's ability to perform as promised and his failure to do so. The lack of other evidence as to his intent compels us to conclude the petitioners have failed to show that Mr. Turner obtained the $10,000 payment through larceny by false promises. The petitioners argued that the $13,500 Mr. Turner obtained from Mrs. Dembner in January 1968 was obtained through the use of larceny by false pretenses and, in the alternative, by extortion. They contended that larceny by false pretenses was committed because of the alleged falsity of the story about Mr. Malkin's personal danger which Mr. Turner told Mrs. Dembner. However, the petitioners adduced no evidence concerning the falsity of the representations. At the very least, the crime of larceny by false pretenses requires that there be a misrepresentation of a fact. People v. Miller, 169 N.Y. 339, 62 N.E. 418 (1902). Since there was no evidence establishing a misrepresentation, *159 we must hold that Mr. Turner did not commit larceny by false pretenses when he obtained the $13,500 loan. In part, section 155.05(2) (e) provides: (e) By extortion. A person obtains property by extortion when he compels or induces another person to deliver such property to himself * * * by means of instilling in him a fear that, if the property is not so delivered, * * * another will: (i) Cause physical injury to some person in the future; * * * As part of larceny by extortion, the owner of the property must be motivated to part with it because of the fear that the threatened act will occur if the property is not transferred. People v. Dioguardi, 8 N.Y. 2d 260, 168 N.E. 2d 683, 203 N.Y.S. 2d 870 (1960). The petitioners argued that Mrs. Dembner lent Mr. Turner the money because she was afraid for Mr. Malkin's safety if she did not do so; but at trail, she testified that she lent Mr. Turner the money because she wanted to forestall the possibility of his departure for California. As a result, the petitioners' evidence does not support their argument and does not establish *160 that the $13,500 was extorted from Mrs. Dembner. Because neither larceny by false pretenses nor extortion has been shown, the petitioners are not entitled to a theft loss deduction for their loss on the $13,500 loan. The next issue we face is whether the petitioners are entitled to bad debt deductions in 1968 under section 166(d) for the items which they treated as casualty losses. Section 166(d) (1) provides in part: (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - * * * (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange * * * of a capital asset held for not more than 6 months. The respondent took the position that the petitioners are not entitled to bad debt deduction for the $16,000 which Mrs. Dembner lent Mr. Turner because they have not shown that the debt was worthless in 1968. Whether a debt is worthless for purposes of section *161 166(d) depends upon an analysis of all the pertinent facts and circumstances and involves a practical approach to the relevant considerations. Henry C. Mueller, 60 T.C. 36 (1973); Emanuel M. Skolnik, 55 T.C. 1055 (1971). We must evaluate the evidence with a view toward determining whether the creditor had a realistic chance of realizing anything on the debt or whether hope of a recovery was futile in the year the creditor treated the debt as a bad debt pursuant to section 166(d). James A. Messer Co., 57 T.C. 848 (1972). We have considered the possibility of successful litigation but have not required a creditor to undergo a charade when, even if a suit could be won, the facts show that the judgment would not be satisfied. Giffin Andrew, 54 T.C. 239 (1970). The petitioners presented two arguments to demonstrate that the $16,000 debt was worthless in 1968. First, for the purpose of showing that litigation would be unsuccessful, they argued that initiating a suit in 1968 would have been futile since, until 1972, they did not know where Mr. Turner was living. Although they did not know where he lived in 1968, the record does *162 not reveal what efforts were made to locate him at that time; the record fails to disclose that they made a reasonable effort to find him. Consequently, to a large degree, their ignorance may have been occasioned by their own lack of effort, and any argument concerning the futility of litigation cannot rest on that ground. Cf. Earl V. Perry, 22 T.C. 968 (1954). The petitioners also argued that even had they sued and won, they could not have collected on their judgment because Mr. Turner had no assets when he left New York in 1968. When Mr. Turner left New York, he was in poor financial condition, but he did own some personal property and owned 180 of Dayna Corp.'s 200 authorized shares, even though they were the subject of a security agreement. Dayna Corp. had some assets, including its equity in two printing machines, office equipment, and furniture. Although Dayna Corp. was not a profitable enterprise, and there were unpaid secured creditors and probably unpaid general creditors when Mr. Turner left, we are unable, from the evidence presented, to say that it had no assets available to satisfy, at least partially, Mr. Turner's obligation to Mrs. Dembner. Mr. *163 Turner had experience in lithography, and it is likely that he could have obtained employment elsewhere. Mrs. Turner, who was also liable for the repayment of the loan, owned 124 shares of AT&T stock and 260 shares of City Gas stock, although until August 1968, they were subject to a security arrangement; her equity in the stock was available to Mrs. Dembner. In the light of these facts, we find that the petitioners have failed to show that the $16,000 debt was worthless in 1968. Henry C. Mueller, supra; Giffin Andrew, supra.
The respondent has conceded that the petitioners are entitled to a bad debt deduction for $34,343, which represents part of the amount Mr. and Mrs. Dembner paid for Chemical's release of the stock pledged to it to secure its loan to Mr. Turner's business. The respondent arrived at this figure by determining the ratio between the fair market value of Mrs. Dembner's stock and the fair market value of all the stock redeemed from Chemical, using the stock market prices of the stock as of the date the redemption agreement was reached. At that time, the fair market value of Mrs. Dembner's stock was $45,240, and the fair market value *164 of all the shares redeemed was $55,328. Consequently, Mrs. Dembner owned 81.77 percent of the total. Applying this percentage to the amount spent in exchange for the stock, $42,000, the respondent concluded that $34,343 was expended in redeeming Mrs. Dembner's AT&T stock. The petitioners did not challenge the respondent's method of computing the amount artributable to the redemption of Mrs. Dembner's stock but argued that such method was not applicable in this case. They contended that no part of the $42,000 paid to Chemical was paid to release Mrs. Turner's stock, and that the entire amount was spent for the redemption of Mrs. Dembner's stock and represents a bad debt loss. The petitioners argued that the money was paid to retire only part of the debt due to Chemical and that such part of the debt was secured only by Mrs. Dembner's stock. However, the facts clearly show that the payment was made in full exchange for the return of Mrs. Dembner's and Mrs. Turner's stock. The transaction was initiated by Chemical pursuant to its foreclosure proceedings and notices were sent both to Mrs. Dembner and Mrs. Turner. As a result of the redemption agreement, the parties executed general *165 mutual releases - the bank released both Mrs. Dembner and Mrs. Turner. No mention was ever made that any part of the underlying debt survived. Accordingly, the facts do not support the petitioners' suggested interpretation of the transaction, and we find that only a part of the payment to Chemical was properly attributable to the redemption of Mrs. Dembner's stock and that the respondent's method for computing that portion of the payment was reasonable. We hold that $34,343 of the payment to Chemical for the redemption of the stock may be treated as a loss from a bad debt. The respondent argued that the lawyer's fees which Mr. and Mrs. Dembner paid in connection with obtaining the return of the stock were nondeductible capital expenditures. Amounts spent in perfecting or completing title to, or an interest in, property are capital expenditures. Vincent Boagni, Jr., 59 T.C. 708 (1973). Other than to argue that the lawyer's fees should be treated as a part of the theft loss - which argument we have already rejected, the petitioners have made no alternative argument for the *166 deductibility of the lawyer's fees. Consequently, we hold that the lawyer's fees are not deductible and that only the portion attributable to securing the return of Mrs. Dembner's stock should be treated as a capital expenditure by her. The respondent determined that the $10,000 payment made by Mr. and Mrs. Dembner in exchange for stock of Dayna Corp. constituted an investment on behalf of Robert Dembner. Except for their argument that the payments gave rise to a theft loss, the petitioners have presented no other grounds for allowing a deduction with respect to those payments. Since we have found that there was no theft of the payments, we hold that the petitioners are not entitled to any deduction with respect to them. The respondent has conceded that the petitioners are entitled to a bad debt deduction for the $13,500 loan Mrs. Dembner made to Mr. Turner. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
2. Any reference to sec. 155.05↩, or any provision thereof, is to the New York Penal Law (McKinney 1967).